J. S36031/17

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.B.H., | : | IN THE SUPERIOR COURT OF |
| A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: P.A.H., MOTHER | : | No. 2558 EDA 2016 |


Appeal from the Decree, July 13, 2016,
in the Court of Common Pleas of Philadelphia County
Family Court Division at No. CP-51-AP-0000574-2016


BEFORE: PANELLA, J., OLSON, J., AND FORD ELLIOTT, P.J.E.


MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED August 4, 2017**

P.A.H. ("Mother") appeals from the decree dated and entered July 13, 2016, in the Court of Common Pleas of Philadelphia County, granting the petition of the Philadelphia County Department of Human Services ("DHS") and involuntarily terminating her parental rights to her minor, dependent child, M.B.H. (the "Child"), a female born in December of 2011, pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1, 2] After review, we affirm.

---

[1] By separate decrees entered the same date, the trial court additionally involuntarily terminated the parental rights of Child's father, C.H. ("Father"), and Unknown Father. An appeal has not been filed by Father or any unknown father, nor is Father or any unknown father a party to the instant appeal.

[2] Upon review, the trial court additionally entered a separate order changing Child's permanency goal to adoption. As Mother does not appeal this order, any such claims related thereto are not preserved. Pa.R.A.P. 903(a) (a notice of appeal shall be filed within 30 days after the entry of the order from which the appeal is taken). Moreover, any such opposition would be

The trial court summarized the relevant procedural and/or factual history, in part, as follows:

**FINDINGS OF FACT**

On September 9, 2013, M.B.H. received a pulmonary examination at the Children's Hospital of Philadelphia ("CHOP"). Thereafter, on September 10, 2013, Mother took M.B.H. to the CHOP Emergency Room after M.B.H. suffered burns to her left arm, left leg, and chest. Rita Himes, a CHOP [t]riage [n]urse, stated that Mother stated to her that M.B.H. had seven hours earlier been lying in bed at the home and had pulled the cord of a clothes iron, causing the iron to fall on M.B.H. Mother stated to Ms. Himes that the burns were caused by the iron falling on M.B.H. and that Mother had treated the burns with cold water and butter; that initially that M.B.H.'s skin blistered and that the blisters had broken. During this emergency room visit, it was determined that M.B.H. suffered from partial thickness burns upon M.B.H.'s left interior arm, the left interior leg, and the left side of the chest measuring two to seven inches. On September 13, 2013, [DHS] received an Emergency General Protective Services Report ("EGPS") alleging that M.B.H.'s weight and height were in the zero percentile for her age and that during M.B.H.'s

---

waived as Mother failed to raise the issue in both her concise statement of errors complained of on appeal and the statement of questions involved section of her brief, and failed to present argument related thereto in her brief. **See Krebs v. United Refining Co. of Pennsylvania**, 893 A.2d 776, 797 (Pa.Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues); **In re W.H.**, 25 A.3d 330, 339 n.3 (Pa.Super. 2011), **appeal denied**, 24 A.3d 364 (Pa. 2011), quoting **In re A.C.**, 991 A.2d 884, 897 (Pa.Super. 2010) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

pulmonary examination that M.B.H. appeared malnourished.

On September 18, 2013, DHS contacted CHOP by telephone and learned that Mother had failed to keep M.B.H.'s follow-up appointment and that CHOP physicians had determined M.B.H.'s burns were likely caused by child abuse and that there were concerns that M.B.H. was malnourished. DHS attempted to contact Mother on her phone on September 20, 2013 and September 21, 2013 but Mother was unresponsive. On September 23, 2013, CHOP asked DHS to contact Mother to schedule an immediate medical examination of M.B.H. because Mother had failed to take M.B.H. to a scheduled September 22, 2013 appointment at CHOP and that Mother had not responded to any phone calls from CHOP.

On September 23, 2013, DHS contacted Mother and asked if Mother had taken M.B.H. for her appointment at CHOP and Mother responded that M.B.H. did not need a medical examination. After determining from M.B.H.'s pediatrician[] that Mother was not ensuring consistent well-child examinations for M.B.H.[,] DHS obtained an Order of Protective Custody ("OPC") for M.B.H. and on that same day DHS went to CHOP to take M.B.H. from Mother's custody.

On September 23, 2013, M.B.H. was placed in a foster home and a Shelter Care Hearing occurred on September 25, 2013, where the OTC was lifted and the temporary commitment to DHS was ordered to stand. At the Adjudicatory Hearing held before the Honorable Judge Jonathan Q. Irvine on October 2, 2013, M.B.H. was adjudicated dependent. The [c]ourt referred commitment to DHS. The [c]ourt referred the Mother to ARC [Achieving Reunification Center] for [p]arenting and [a]nger [m]anagement. The [c]ourt further ordered that there be one hour supervised visits at the agency.

The initial Family Service Plan ("FSP") meeting was held on December 16, 2013. The parental

objectives were that (1) Mother would set age appropriate expectations; (2) Mother would participate in mental health evaluations; (3) Mother would keep all visits and maintain regular contact with M.B.H. and (4) Mother would locate and occupy suitable housing for M.B.H. At the subsequent Permanency Review Hearing on December 18, 2013, Mother was (1) referred to Behavioral Health System ("BHS") for consultation; (2) to attend anger management classes and (3) receive the BHS evaluation and parenting class though the Parent Action Network ("PAN").

On June 19, 2014, a Permanency Review Hearing was held and the [c]ourt ordered (1) that M.B.H. remain committed; (2) DHS would follow up with ARC about parenting classes for Mother; and (3) Mother would sign releases at the Community Council Health Systems. At the next Permanency Review Hearing on September 3, 2014, the [c]ourt ordered (1) that Mother be referred to BHS for monitoring and (2) Mother sign releases at the Community Council.

A second FSP was created on September 30, 2014, and the parental objectives for Mother were that Mother (1) set age appropriate expectations; (2) participate in mental health evaluation and follow treatment recommendations; (3) maintain all visits and regular contact with M.B.H.; (4) comply with objectives and court orders and (5) locate [] suitable housing for the family. At the subsequent Permanency Review Hearing on December 3, 2014 the [c]ourt determined that there had been minimal compliance with the permanency plan by Mother and Mother was (1) re-referred for anger management; (2) referred to a comprehensive biopsychological evaluation[3] at [sic] [p]arenting [c]apacity [e]valuation ("PCE"); (3) Mother was to sign a release; and (4) DHS would refer Mother for therapeutic visits.

---

[3] The order in question refers to this evaluation as a comprehensive biopsychosocial evaluation. (*See* DHS Exhibit 2 at 17-19.)

On January 6, 2015, Mother participated in a comprehensive biopsychological evaluation which stated that Mother had clearly defined narcissistic personality traits and that the Mother's anger and apparently transient depressive symptoms merited intervention so as not to further complicate attempts to reunify mother and child. Thereafter a Permanency Review Hearing was held on March 9, 2015 and the court determined that Mother (1) had completed her biopsychological examination; (2) Mother was engaged through [sic] therapy through the Community Council Health Systems; and (3) the DHS was to make referral housing for Mother.

At a Permanency Review Hearing on June 10, 2015 held before the Honorable Jonathan Q. Irvine, the [c]ourt determined that Mother (1) had completed anger management classes and was attending mental health treatment consistently; (2) was working full time; (3) Mother was referred to CEU for a drug screen and dual diagnosis plus three random drug screens prior to the next court date.[4]

At the Permanency Review Hearing on October 7, 2015 held before the Honorable Judge Irvine, the [c]ourt determined that Mother (1) the mother [sic] be referred to CEU for assessment, dual diagnosis, monitoring and three random drug screens prior to the next court date.[5] At the Permanency Review Hearing on February 17, 2016, held before the Honorable Judge Irvine, the [c]ourt again determined that Mother (1) the mother [sic] be referred to CEU for assessment, dual diagnosis, monitoring and three random drug screens prior to the next court date.

---

[4] Mother was additionally referred for monitoring on this date. (DHS Exhibit 2 at 21-22.)

[5] Review of the record reveals that Mother was only referred for drug screening on this date. (*Id.* at 22-24.)

> By June of 2016, M.B.H. had not resided with her mother for three (3) years. Mother had become noncompliant with visitations and court ordered CEU screens. Mother did not show up to any CEU appointments in 2016. Mother was asked to comply with random screening on April 19, 2016 but did not show up. Interactions between Mother and DHS [s]taff had continued to be acrimonious and hostile as a result of Mother's uncontrollable anger. DHS reported that between M.B.H. and her caregiver there existed a strong bond and that the caregiver wanted to adopt M.B.H. and no such bond existed between Mother and M.B.H.

Trial court opinion, 9/7/16 at 2-6 (unpaginated; citations to record omitted).

On June 24, 2016, DHS filed petitions to involuntarily terminate parental rights and for a goal change. Thereafter, the trial court conducted a combined termination and goal change hearing on July 13, 2016. In support of its petitions, DHS presented the testimony of DHS social worker, Jennifer Koslosky, and APM (Asociación Puertorriqueños en Marcha) foster case manager, Delores Englero. Mother additionally testified on her own behalf. Likewise, Father was present and testified on his own behalf.

By decree dated and entered July 13, 2016, the trial court involuntarily terminated Mother's parental rights to Child.[6, 7] On August 11, 2016, Mother

---

[6] The trial court announced its decision, memorialized by subsequent decree, on the record on July 13, 2016.

[7] The Child Advocate, Tara Amoroso, Esq., argued in support of the termination of Mother's parental rights. *Id.* at 70-71. We note here that in a divided decision our supreme court recently held in *In re Adoption of L.B.M.*, 2017 WL2257203 (Pa. 2017), that 23 Pa.C.S.A. § 2313(a) requires a trial court to appoint counsel for a child in contested involuntary termination of parental rights proceedings and the failure to do so is structural and can

filed a timely notice of appeal, along with a concise statement of errors

complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[8]

On appeal, Mother raises the following issues for our review:

> A. Whether the trial court committed reversible error when it involuntarily terminated Mother's parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act[,]

---

never be harmless. The decision was originally filed on March 28, 2017, but was corrected and replaced on May 23, 2017. Authoring Justice Wecht, joined by Justices Donohue and Dougherty, sought to hold that a trial court is required to appoint separate, independent counsel to represent a child's legal interests even when the guardian **ad litem** is an attorney. However, Chief Justice Saylor, and Justices Baer, Todd, and Mundy, disagreed in different concurring and dissenting opinions with that part of the lead opinion's holding. Specifically, while the other justices agreed that the appointment of counsel for the child is required in all involuntary termination proceedings and that the failure to do so by the trial court is structural error, they did not join that part of Justice Wecht's opinion which sought to hold that the guardian **ad litem** may never serve as counsel for the child. Rather, such separate representation would be required only if the best interests and legal interests were somehow in conflict. Herein, Mother did not raise before the trial court any concerns which would have created a need to appoint independent counsel to advocate for Child, nor does she make any claims on appeal that the Child Advocate, Attorney Amoroso, did not properly represent the Child's legal and best interests due to a conflict of interest. Indeed, in this case, Attorney Amoroso zealously represented Child.

[8] Notably, Mother filed her notice of appeal and concise statement of errors complained of on appeal **pro se**. Subsequent to the dismissal and reinstatement of Mother's appeal in relation to her Pa.R.A.P. 3517 docketing statement, as Mother was still represented by appointed counsel, by order dated December 6, 2016, this court remanded the matter to the trial court to determine whether counsel had abandoned Mother and take further action as necessary to protect Mother's appellate rights. By order dated February 7, 2017, referencing counsel's filing of a docketing statement on behalf of Mother, the trial court determined that counsel had not abandoned Mother.

> 23 Pa.[C.S.A. § 2511 (a)(1), (2), (5), and (8)] as [M]other had completed her FSP goals, namely the [p]arenting [c]apacity [e]valuation ("PCE"), compliance with ARC, anger management, and mental health services, and was working full time?
>
> B.   Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights without giving primary consideration to the effect that the termination would have on the developmental physical and emotional needs of the child as required by the Adoption Act[,] 23 Pa.[C.S.A. § 2511(b)]?

Mother's brief at 4.[9]

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." ***In re Adoption of S.P.***, 47 A.3d 817, 826 (Pa.

---

[9] We observe that, in her brief, Mother stated her issues on appeal somewhat differently from her Rule 1925(b) statement filed with her notice of appeal. We, nevertheless, find that Mother has preserved challenges to the trial court's termination of her parental rights pursuant to Sections 2511(a)(1), (2), (5), and (8). To the extent Mother addresses Subsection (b) in her brief, however, Mother waived any contest under this subsection as she failed to raise it in her Rule 1925(b) statement. **See Krebs**, 893 A.2d at 797 (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues). **See also In re M.Z.T.M.W.**, 2017 WL 2153892 (Pa.Super. May 17, 2017) (holding that the appellant waived her challenge to Section 2511(b) by failing to include it in her concise statement and statement of question involved). Nevertheless, in light of the requisite bifurcated analysis, we review this issue below and determine that, had Mother preserved this issue, we would have found it lacked merit.

2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court

> determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*), quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998). In this case, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8), as well as (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc)*. Here, we analyze the court's termination decree pursuant to Subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .

> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
> >
> > . . . .
> >
> > **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity,

- 11 -

> abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015), quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002).

Instantly, in finding grounds for termination pursuant to Section 2511(a)(2), as well as (a)(1), (5), and (8), the trial court reasoned as follows:

> The record demonstrates Mother's ongoing unwillingness to provide care or control for M.B.H. or perform any parental duties and her failure to remedy the conditions that brought the child into care. The documents and testimony discussed below provided this [c]ourt clear and convincing evidence that termination of Mother's parental rights would be in the best interests of M.B.H.
>
> Mother's FSP [o]bjectives were established on December 17, 2013 and later modified on September 30, 2014. Pursuant to the FSP [o]bjectives and [c]ourt orders, Mother was ordered to maintain all visits and regular contact with M.B.H.; Mother would participate in an evaluation for drugs and alcohol; and Mother would sign releases to allow DHS to receive documentation to determine Mother's compliance with mental health treatments. The record shows that [] Mother has not complied with the [c]ourt [o]rders and FSP [o]bjectives.

Mother failed to comply with FSP [o]bjectives to maintain all visits and regular contact with M.B.H. Mother had never had unsupervised visits with M.B.H. Mother visits with M.B.H. were sporadic and infrequent. Routinely, Mother would call and confirm a visitation date and then M.B.H. would be taken to the agency and Mother would cancel in the last minute or not show up, which affected M.B.H. In 2016, [DHS] scheduled appointments for Mother to visit M.B.H. on January 7, the 14th, the 21st, the 28th, February 4th and February 11th[,] but Mother only visited M.B.H. on January 28th. Thereafter, Mother did not visit M.B.H. until March 17, 2016[,] followed by a final visit on June 16, 2016. Mother also failed to comply with FSP objectives and/or [c]ourt orders by failing to execute releases to allow DHS to obtain mental health and alcohol reports and to partake in drug and alcohol testing.

Based upon the testimony elicited at the Termination Hearing as well as the documents in evidence, this Court found clear and convincing evidence to terminate Mother's parental rights pursuant to 23 Pa.[C.S.A. § (a)(1), (2), (5), and (8)] as Mother had failed to remedy the conditions that brought the child into care based upon her unwillingness to visit M.B.H.; cooperate with DHS as to drug and alcohol testing; her refusal [sic] releases; and Mother's lack of interest in M.B.H.'s medical treatment. Furthermore, Mother['s] refusal to cooperate and utilize DHS services demonstrated that Mother could not remedy the conditions that had led to M.B.H. being adjudicated dependent and placed in foster care in 2013 within a reasonable period of time.

Trial court opinion, 9/7/16 at 8-10 (unpaginated; citations to record omitted; footnote omitted).

Mother, however, argues that she endeavored to create and/or maintain a relationship with Child as evidenced by her efforts at compliance

with her FSP objectives. (Mother's brief at 7-8.) Mother highlights her participation in mental health treatment, completion of parenting classes and anger management, presentation for CEU screenings in June and July 2015, as well as her securing of employment and housing.[10] (*Id.* at 8.) Further, through such efforts Mother asserts that she "exhibited she was eradicating any repeated neglect that caused [Child] to be placed in foster care." (*Id.* at 8.) Mother states, "To the best of her ability, Mother showed that the causes that brought the child in question into care could indeed be remedied." (*Id.*) We disagree.

A review of the record supports the trial court's determination of a basis for termination under Section 2511(a)(2). Mother failed to complete her established FSP objectives. DHS social worker, Jennifer Koslosky, recounted Mother's FSP objectives as follows:

> The objectives for mother are that she will participate in individual counseling, she will keep all supervised visits and maintain all contact with the child, she will participate in a parenting capacity evaluation at ATA [Assessment & Treatment Alternatives] and comply with the recommendations made from that evaluation, she will participate in an evaluation for drug and alcohol assessment at CEU, she will comply with any recommendations made by CEU. Mother will sign authorization forms to allow DHS to obtain copies of her mental health and drug and alcohol reports. Mother will achieve and maintain sobriety and will not abuse illegal drugs. Mother will comply with the court order. Mother will locate and occupy suitable housing.

---

[10] Mother incorrectly references 2016.

Notes of testimony, 7/13/16 at 28-29. Pursuant to court order, Mother was also referred for parenting classes and anger management, as well as random drug screens. (**See** DHS Exhibit 2.) Significantly, Ms. Koslosky expressed her belief that Mother had not completed and complied with her FSP objectives to move forward with reunification. (Notes of testimony, 7/13/16 at 34.) Mother completed the parenting capacity evaluation, parenting classes, and anger management. (**Id.** at 42-44, 50.) However, while Mother completed parenting and anger management,[11] there was evidence that neither were effective. Foster case manager, Delores Englero, observed no improvement in parenting, despite completion of parenting classes, and noted concern for Mother's behavior towards others, noting, for example, Mother's yelling and use of profanity, and verbal aggression. (**Id.** at 56-57, 59-61.) Further, although Mother had obtained housing in a Shelter Care Plus program, her housing had yet to be assessed by DHS due to her lack of cooperation and contact with DHS. (**Id.** at 31-32, 50.)

---

[11] Ms. Koslosky testified that there was no certificate as to completion of anger management in the file. (**Id.** at 42-44.) However, Ms. Koslosky indicates the parenting capacity evaluation reflects completion, as does the court record. (**Id.**; DHS Exhibit 2 at 20-22.)

Moreover, as reported by Ms. Englero, this housing was not stable as it was "contingent" on reunification with Child.[12]  (*Id.* at 61.)

In addition, although Mother previously attended therapy at ARC, provided through Community Council (*id.* at 29), no evidence was offered establishing compliance with mental health treatment.[13]  (*Id.* at 29-30, 50.) Similarly, no evidence was offered establishing compliance with drug and alcohol treatment.  (*Id.* at 30-31, 50, 62.)  As testified by Ms. Koslosky, Mother failed to report to CEU in 2016.  (*Id.* at 30.)  Mother, therefore, last submitted to screening in June and July 2015.  (*Id.* at 48.)  Critically, Ms. Koslosky stated she was unable to send Mother for screening due to Mother's unresponsiveness.  (*Id.* at 42.)  Moreover, DHS was unable to acquire signed releases in order to obtain documentation to determine Mother's compliance due to Mother's lack of cooperation and contact.  (*Id.* at 29-31, 47-48.)

Lastly, Mother's visitation with Child remained supervised until suspended in June 2016.  (*Id.* at 51.)  Notably, Mother's visitation, after commencing as supervised on a weekly basis at the foster care agency, was

---

[12] As testified by Ms. Koslosky, "in order to obtain housing through Shelter Care Plus, [Mother] would need either have to have a drug and alcohol addiction or mental health Axis 1 diagnosis." (Notes of testimony, 7/13/16 at 31-32.)  Ms. Englero indicated that the social worker she spoke with regarding Mother's housing program did not, however, report any requirements related to sobriety or enrollment in a mental health program. (*Id.* at 62).

[13] Mother had a history of depression and anxiety.  (*Id.* at 32.)

altered to therapeutic visitation at ATA from February through March of 2015.[14] (*Id.* at 52.) Ms. Englero, who supervised the visitation at the agency (*id.* at 33), recounted that Mother's visitation subsequently became inconsistent and was eventually changed to biweekly in February 2016. (*Id.* at 51-52, 59, 66.) After Mother's last visit with Child in June 2016,[15] Mother's visitation was suspended by the trial court due to a negative impact on Child, including self-induced vomiting resulting in weight loss, enuresis, and encopresis.[16] (*Id.* at 36, 54-55; DHS Exhibit 3.) Consultation with Child's therapist from Northeast Treatment Centers ("NET") Behavioral Health & Social Services yielded support for suspended visitation. (*Id.* at 40-41; Child Advocate Exhibit 1.) Director of OP and Specialized Services, Harry Allen, noted in part, "past parental contacts have resulted in a significant increase in problematic behaviors in the home, refusal to eat, sleep difficulties, and difficulty with emotional regulation." (Child Advocate Exhibit 1.)

---

[14] As testified by Ms. Englero, Mother was referred for therapeutic visitation due to the focus on the telephone during Mother's visits with Child. (*Id.* at 58-59, 66-67.)

[15] We observe that there was a three-month gap in visitation prior to this visit. (*Id.* at 36, 54.)

[16] Mother's visitation was suspended by agreement of DHS and the child advocate pending the goal change/termination hearing. Counsel for Mother had no position. (DHS Exhibit 3.) Significantly, Mother did not appreciate the connection between visitation and Child's behavior/health. Mother's reaction to the suspension of her visitation and reasoning was "'what does that have to do with me?'" (Notes of testimony, 7/13/16 at 56.)

As this court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006). Hence, the record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for his physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation. *See id.* As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). *In re B.L.W.*, 843 A.2d at 384.

We next determine whether termination was proper under Section 2511(b). Our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare"

> requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

Our supreme court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, *supra* at 268. The court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts

fail . . . the result, all too often, is catastrophically maladjusted children."

***Id.***

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

***In re Adoption of C.D.R.***, 111 A.3d at 1219, quoting ***In re N.A.M.***, 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and citations omitted).

In determining that termination of Mother's parental rights favored Child's needs and welfare, the court concluded:

> The [c]ourt further found that because there was not a strong bond between Mother and M.B.H., terminating parental rights would not cause the child[] irreparable harm and would be in the best interest of the child pursuant to 23 [Pa.C.S.A. § 2511(b)].
>
> At the Termination Hearing, the DHS Social Worker testified that the child had developed a strong bond with the caregivers since being in care. The DHS worker testified:
>
>> She's (M.B.H.) in a wonderful foster home. They're-she is very bonded with her foster parents, they love her deeply. They would love to adopt her. She's

- 20 -

been there almost three years. The foster parents are who she knows as her mother and father. They're the people that take care of her each day.

M.B.H. is very well bonded with the foster mother and father. She's also bonded with the foster children in the home, the foster siblings. M.B.H. refers to P.A.H. as her other mother, and she says she does not want to go see her other mother, she only wants to stay in this house (the foster home).

The DHS worker testified that there was a degree of a disconnect between M.B.H. and Mother during Mother's visits:

Mom would pass M.B.H. the phone to play with it or call someone and have M.B.H. talk to them. It was -- I think there was just a handful of times where mom brought healthy snacks that were allowed to M.B.H. and actually sat there and interacted. It was more based around the phone.

At the Termination Hearing, the DHS worker testified that M.B.H. would not suffer irreparable harm if Mother's parental rights were terminated, that the change of adoption would be in [C]hild's best interests. The testimony of the DHS Worker was deemed to be credible and accorded great weight. As the testimony before this [c]ourt on July 13, 2016 indicates, the evidence is clear and convincing that Mother did not remedy the conditions that caused her child to come into care and thus has been and continues to be unable to provide proper care for her child, warranting involuntary termination of the [m]other's parental rights pursuant to 23 [Pa.C.S.A. § (a)(1), (2), (5), and (8)]. This [c]ourt further concluded that termination of Mother's parental rights would be in the best interest of M.B.H.

Trial court opinion, 9/7/16 at 10-11 (unpaginated; citations to record omitted).

Mother, however, maintains that there continued to be a bond between her and Child. (Mother's brief at 12.) She further points to the trial court's reliance on non-expert testimony. (*Id.*) Mother argues that, prior to the termination of her parental rights, the trial court "should have considered the bond between her and the child as it affects and impacts the needs and welfare of the child." (*Id.*) Again, we disagree.

Upon review, the record supports the trial court's finding that Child's developmental, physical, and emotional needs and welfare favor termination of Mother's parental rights pursuant to Section 2511(b). There was sufficient evidence to allow the trial court to make a determination of Child's needs and welfare, and as to the existence of a bond between Mother and Child that, if severed, would not have a detrimental impact on her.

Noting Mother's lack of knowledge and ability to address Child's medical conditions and needs,[17] Ms. Koslosky explained that Mother was not in a position to care for child on full-time basis. (Notes of testimony, 7/13/16 at 32.) She further indicated that Mother could not safely take

---

[17] Child "attends therapy sessions at [t]he NET. She also sees a few specialists at Saint Christopher's. She's monitored by the growth clinic because when she was initially placed with DHS, she was at a zero percentile for weight and height." (Notes of testimony, 7/13/16 at 5.) Child takes approximately six medications in the morning and six medications at night, suffering from asthma, acid reflux, and failure to thrive. (*Id.* at 12.)

Child home and care for her. (*Id.* at 36.) By way of explanation, Ms. Koslosky referenced Mother's lack of concern and/or inquiry regarding Child and her medical condition after the last visit. (*Id.*)

Likewise, Ms. Englero expressed concerns as to Mother's ability to parent Child, noting Mother's visitation with Child never progressed beyond supervised, as well as Mother's failure to appreciate the impact of visitation on Child. (*Id.* at 56.) Further, while acknowledging Mother completed parenting classes, Ms. Englero observed no improvement. (*Id.*) She highlighted Mother's inconsistency regarding visitation with Child (*id.* at 56), as well as continuing concerns regarding Mother's behavior toward others. (*Id.* at 57.)

As indicated above, Mother's visitation with Child was inconsistent and had a negative impact on Child, both physically and emotionally. In addition, as relayed by Ms. Englero, Child did not want to see Mother. Ms. Englero testified that upon being informed of the suspension of visitation, Child stated, "I don't want to see the other mommy [Mother]. I want to stay here with this mommy [Foster Mother]." (*Id.* at 63-64.)

Moreover, and more importantly, Child is in a pre-adoptive home where she has resided since being removed from Mother. Child has formed a positive relationship with her foster family and desires to remain with her foster family. As described by Ms. Koslosky, "She's in a wonderful foster home. They're -- she is very bonded with her foster parents, they love her

dearly. They would love to adopt her. She's been there almost three years. The foster parents are who she knows as her mother and father. They're the people that take care of her each day." (*Id.* at 34.) Similarly, Ms. Englero offered, "[Child] is very well bonded with the foster mother and foster father. She's also bonded with the foster children in the home, the foster siblings. [Child] refers to [Mother] as her other mother, and she says she does not want to go see her other mother. She only wants to stay in this house." (*Id.* at 56.) As such, both opined that it was in Child's best interest for the goal to be changed to adoption and that Child would not suffer any irreparable harm as a result of terminating Mother's parental rights. (*Id.* at 34, 55.)

Thus, as confirmed by the record, termination of Mother's parental rights serves Child's developmental, physical, and emotional needs and welfare. While Mother may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent,

- 24 -

healthy, safe environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b).

Decree affirmed.

Judgment Entered.

JosephD.Seletyn,Esq.
Prothonotary

Date: 8/4/2017